The first case this morning is 524-0775, People v. Finley. Arguing for the appellant is Don Colts. Arguing for the appellee is Sharon Shanahan. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings today. Good morning. Good morning, your honor. Hopefully, wherever you all are at, the storms aren't going to affect you. Some of us, I think, might have some serious storms coming our direction. So if there's any kind of technical difficulties due to that, we'll address them at that time. But again, hopefully you guys are all in safe locations. So it's okay if I take off and run to the basement? If you must, we will accept that. Yeah, we might all do that. Okay, so is it Colts or Coltsy? It's Coltsy. So more of a German pronunciation. All right. Well, if you are prepared to begin, you may do so. Yes. May it please the court. Good morning, justices, counsel, John Coltsy on behalf of the State Appellant Defender for the appellant, Mr. Joseph Finley. Mr. Finley raised three issues on appeal and I'd like to concentrate my arguments on the first issue that the police search of Mr. Finley's residence was unlawful. This was an illegal search for three reasons. First, Mr. Finley had a legitimate expectation of privacy in the sunroom where he had resided for approximately 11 months before the search occurred. Second, Teresa Eastep, his mother, did not have common authority to consent to the police entry or the search of his residence. And third, the doctrine of apparent authority does not excuse the warrantless entry into Mr. Finley's residence by police. The chief evil against which the wording of the Fourth Amendment is directed is unauthorized physical entry into one's home. The Fourth Amendment's protection applies to the entry of a home regardless of whether it's to affect an arrest or to search for an evidence of a crime. As a threshold inquiry for protection of the Fourth Amendment, as I mentioned before, a person must have a legitimate expectation of privacy in the area that is searched or accessed. Here, it was uncontested below that Mr. Finley had a legitimate expectation of privacy in the sunroom portion of the Tash garage that he used at his residence for 11 months. At the motion to suppress, the state did not challenge that Mr. Finley had a legitimate expectation of privacy in his detached residence. In fact, Lieutenant Spindler testified at the motion to suppress that in his police report, he wrote that Finley had an expectation of privacy in the garage and further that Ms. Eastep did not have the authority to consent to a search there. Furthermore, Finley had a subjective expectation of privacy in the sunroom because he had been using it as his residence to sleep nightly for over 11 months and had been using that space specifically as his residence. At trial, Ms. Eastep testified that he slept no other place. And third, this use was authorized by Ms. Eastep. They had an informal agreement that Mr. Finley could sleep in the sunroom portion of her garage and that she acknowledged he had been using it for 11 months at that time the search occurred. Let me stop you for a moment. Does ownership have any play in this portion of your argument? In other words, the defendant did not own the property, correct? Correct, your honor. He didn't have a lease, a written lease of any kind, did he? There was no formal lease. However, that does not diminish his expectation of privacy in the space based on how he used the space, the extent of time he used it. One of the important factors of a legitimate expectation of privacy is prior use and also authorized use. He was authorized to use the space by his mother. They didn't have a formal agreement, but they had an agreement that he could stay there as long as he needed and she never exercised any right to change that. He had been using it for a consistent amount of time. This wasn't a one-time or isolated incident. Further, I think most importantly regarding legitimate expectation of privacy and also common authority is that Finley exercised his ability to exclude others by regularly locking the door. He put a padlock on that door. There was testimony that it was locked when he was not there and he had the only key. Was the door locked when the police arrived for this incident? The door was not locked at the time that the police arrived at this incident, but that doesn't diminish or impact the examination of whether Ms. Estep has common authority to enter under USB matlock. The test delineated by the Supreme Court is mutual use by persons with joint or access or control over the space. The testimony at trial was unequivocal that Ms. Estep had no use of the space where Mr. Finley resided. She didn't store any of her own items there. She didn't have a possessory interest in any of the items there and she testified she never even accessed the space, but for limited short encounters to talk to Mr. Finley and let him know that dinner was ready. I think she testified that she never saw him or the space for more than a couple seconds in the weeks leading up to the search. This is consistent with Officer Lieutenant Spindler's conclusion in his police report that Ms. Estep did not have the common authority to provide access to that space for police. This is consistent also with the argument in closing at trial. The state during its closing arguments when trying to prove constructive possession or that Mr. Finley possessed the firearm and the ammunition specifically stated Mr. Finley is the only person with exclusive control by his actions and the testimony that he has control over that sunroom space. I mentioned this twice both at 525 and 527 of the record. So, where Ms. Estep had no authority to consent to the search and Mr. Finley had a legitimate expectation of privacy in that sunroom space, the presumption is that warrantless entries are unreasonable and unlawful. There is another exception applies which I think is really the heart of this case is the doctrine of apparent authority. In Illinois v. Rodriguez, the U.S. Supreme Court set forth the doctrine of apparent authority and it said that even if an individual who consents does not have common authority, if the police reasonably believe the person has common authority, that they may access the space or the warrantless search is unlawful. However, there's a caveat. If the circumstances known by police at the time of the search indicate that there's ambiguity between the relationship or ambiguity about the consent and the facts and circumstances, they're required to inquire further and so they can resolve those ambiguities and they're not allowed to assume to fill in the gaps. The best evidence here that there was ambiguity is that the police in fact did do this inquiry, they just did it after they had already made an unlawful entry into Mr. Finley's residence. Once the police were inside and they noted items that they would like to recover, Mr. Officer Spindler then questioned Ms. Estep about her ability to access the space and the nature of the relationship. He mentioned this was not an onerous inquiry that he was required to do. He said it was a short conversation and at the conclusion of that conversation is where he Ms. Estep had the authority to consent to the search. His need to even inquire in the first place afterwards exhibits that there is ambiguous circumstances here, that there were things unresolved by the police based on what they knew when they showed up at Mr. Finley's residence regarding Ms. Estep's ability to enter. It's clear the police knew that Mr. Finley resided in the sunroom before they arrived. They testified that they had had numerous encounters with Ms. Estep and Mr. Finley before this. They knew he lived in a separate structure. The first thing the police do after talking to the individual about the altercation is say, let's go to Joey's place and they walk towards his garage only, the area where he was living in the sunroom, bang on the side of the house and say, hey Joey, Charleston Police. They didn't go to Ms. Estep's door. They didn't go to her house and ask her to let them into the garage. The police also knew that Mr. Finley wasn't just living there on that occasion. They had been there previous times. So they knew this was an extended use situation where he had made use of the space for him. And further, they noted outside of the space when they were first there that they said, they said, look at all these toys. He must be here, which indicates that Mr. Finley had made the space his own. Also, unlike other cases involving apparent authority in Illinois, there was no evidence of Ms. Estep's prior use of the space when the police came to the scene on the day of the search. When they arrived at the location, Ms. Estep was inside of her house and she heard the police calling out for Joey, looking for Joey. And she then mentioned, I didn't think he was here and came out and notably only provided that she would knock on the door and check. And that's exactly what she did when she came out of her house. When the police again asked, we're looking to speak to Joey. We don't think he's in any trouble. We just want to get his side of the story. Ms. Estep said, I'll knock on the door. And that's precisely what she did. She knocked on the door. And then only after she knocked on the door and looked inside and said, he's not here, resolving any punch the police may have had that Finley was in his residence after this altercation, she said, you can look, he's not in here. Now at that point, that's the point where the inquiry based on the ambiguous circumstances has to occur. Not after they've already gone in, looked around inside his private residence and then found items of contraband. They need to stop right there and ask the simple questions that they did ask or the simple, could have been resolved with a single question by police here. The bat, are you allowed in this space on this space? Do you normally go in this space? And she would have indicated that it's typically locked when he's not there. And I only go in to briefly talk to him. And that would have, this isn't a case where we have to hypothesize about where the inquiry would have led. It's clear where their inquiry would have led. They would have known that Ms. Estep did not have the authority to enter into the garage space. So where Mr. Finley had a legitimate expectation of privacy, where there was no common authority to support a consent search and the apparent authority did not excuse the warrantless search because the police were required to inquire further, this court should reverse Mr. Finley's firearm and ammunition convictions outright because this evidence should have been suppressed at the motion to suppress and without them, the state cannot succeed on these charges. Thank you, your honors. Let me ask you a couple of questions with regard to the exclusive use of the property by Mr. Finley. Wasn't there testimony that there were other people that stored property in there, in that location, in that room, and that there was perhaps other people with keys, his wife, who was no longer residing with him and potentially others? Yes, Justice. There was testimony that people had possibly stored items in the garage. He basically said that the items that they found weren't his. He didn't know whose toolbox it was. He didn't know whose gun it was. He didn't know where the ammunition came from. All of those things tend to lend themselves to him not having exclusive control over that property. So two points, that people previously stored items in the garage before he lived there doesn't impact the common authority for Ms. Estep to consent to the search. Common authority is based on the idea that a third party can consent to a search and so we look to that third party who provided consent's ability to enter the garage space. I think it's clear as the state admitted and in briefs we argue that the state actually forfeited the argument about a legitimate expectation of privacy. There's no indication in the record here that any of those individuals ever accessed the space while Mr. Finley was living there to retrieve any of their items, used the key, that that key was the same key as the key lock that Mr. Finley asserted control over the space over. So the fact that there might be items in this storage area before he lived there that weren't his doesn't impact Mr. Finley's expectation of privacy in that space. The fact that he was exerting control with his own locking key, that he had no reason to believe that people could access it and he'd be submitted to a police search because there's no evidence in the record that any of these people could or did access the garage to retrieve those items. And it certainly doesn't impact what the police knew at the time for the examination of all the facts and the ambiguity created around whether Ms. Estep could provide consent based on the fact that we had independent living structures where Mr. Finley resided separate from his mother. Ms. Estep testified that she never slept in there, she never accessed it. So whether there was previous items stored there, existing items once he moved in doesn't impact the decision in this case primarily because he had an expectation, a legitimate expectation of privacy through all the factors I outlined. And second, it is essentially irrelevant to Ms. Estep's common authority, her consent, because we look to the consenting party's ability to consent to the police search, not any hypothetical person that could have provided consent to. So when you call this room a separate living space, was there running water, bathroom facilities, anything like that in the room that he stayed in? No, so this is something that the trial court had mentioned. There was no outside signs that this was a habitable space, but regardless of the Spartan-like conditions of the room, the police knew he lived there. They knew he used it as his residence and slept there regularly based on their prior experiences and contacts with them. So many spaces don't show outward signs of water or heaters or things, but the fact that Mr. Finley chose to live in those conditions isn't dispositive of the question here. We know he lived there. His mother testified he lived there. No one contested he lived there. And the police were aware that he lived there. They immediately went to his side of the space and they said, this is where Joey is living. So regardless of the type of structure, he had maintained control over it and used it as his nightly residence for almost 11 months. One last question for me, and obviously if Justice Vaughn or Justice Clark have questions, they can jump in at any moment. With regard to the other argument that you raised or other issue that you raised with regard to the felon in possession of a firearm or unlawful possession, I know you cite to People v. Stevens, 5th District case from 2024. Do you make any mention or acknowledge People v. Smith from the 5th District? People v. Smith is acknowledged in the reply brief, and we do acknowledge that it considered whether primarily discussed felons are considered of the people for the purposes of the first stage inquiry of Bruin. And I know People v. Stevens came out before a lot of these decisions. It relied on People v. Ware, and it did rely. I know this district, as recent as Thursday, has followed Smith's holding that the felons are not of the people. But I would point to the U.S. Supreme Court's in People v. Rahimi, where despite the fact that there was an issue of dangerousness with the defendant, they advanced to the second step, indicating that categorically felons are not precluded from the people, and that we look at that conduct in the second step to determine whether or not. And that's why there's an important question in this case about just dangerousness. I'm aware that the Illinois Supreme Court has taken this issue up in People v. Benson, and we're waiting for a decision from them as well about categorical denial of Second Amendment rights to felons as well. All right, thank you. Justice Vaughn, Justice Clark, any questions? No, thank you. You asked my questions. I had a question. Did the trial court make a finding that Ms. Estep had a param authority? The trial court did make a specific finding that Ms. Estep had common authority. And its basis on finding that Ms. Estep had common authority was the outward signs of living space, but also that he noted tools and items in there that might have used commonly. But we know from the testimony at trial, it's unequivocal, she didn't, none of those items were hers. She didn't possess any, she didn't use any, she didn't access any, and she didn't access that space at all, other than to contact Mr. Henley. What's our standard review with regard to the trial court's finding? So the standard review is abusive discretion for findings of fact and deniable for conclusions of law. Trial court didn't make any findings of facts that impact on this other than it did note that the officer, it made some incorrect findings of fact and noted that the officer, that the reason Ms. Estep knocked initially was that perhaps she believed that her son was armed. However, she had no information, she had no clue there was a, that there was an armed altercation outside. All the police told her was that there was an altercation, she didn't know anything about a gun. So the notion or the inference that she knocked as a precautionary measure was not supported in any way by the record. But I think this court can review the legal findings of the court based on what the one, the testimony from trial that was clear, the state's own admission at trial that Mr. Finley had exclusive control over this space and that Teresa Estep didn't use it at all. And also it can review the findings regarding apparent authority, what the police, the court didn't, trial court at the suppression hearing didn't very, you know, engage very in depth about apparent authority, about what the facts the actually knew and what the ambiguity was here in this case based on the distinct living structures and the time that Mr. Finley had been living there. And so it just, it simply concluded that it had apparent authority because she said she could enter. Thank you. It's loud here, I put in my earbuds, it's storming here, I'm getting hail and heavy rain, I have a metal roof above my part of the office chamber, so I put in my earbuds so I could hear better. Thank you. Let me, let me follow up with that, your answer to Justice Vaughn's question. One final question. When it comes to the common authority that the court found, it also considered the fact that it, there was testimony from the defendant himself that he to the room that he stayed in is my mother's place. How much does that play into the court's reasonableness in their decision, in its decision, I should say? Mr. Finley's statements reflect that he, you know, the property ownership of his mother, which is not conclusive on expectation of privacy, is legitimate expectation of privacy or privacy rights. And this court, you know, Illinois courts have held for 60 years that privacy rights are not determined by property rights. Okay. All right. Well, thank you very much. And no further questions, I assume, Justice Clark, Justice Vaughn? Okay. No. Okay. You'll have time in rebuttal. Thank you. Thank you. Ms. Shanahan. Thank you, your honor. May it please the court, counsel. My name is Sharon Shanahan and I represent the people of the state of Illinois. Before I get into actually arguing the facts of this case, there's something I'd like to point out. And that is we are reviewing a motion, the denial of a motion to suppress evidence. And although this court can consider facts that occur at trial in affirming, that same legal principle does not apply to reversing. There are a couple of Supreme Court cases that say that. I would be glad to cite them to this court or to provide them as supplemental brief, but I'm just stating them right now as a matter of law that a reviewing court can affirm a trial court suppression ruling based on evidence that came out at trial. But this does not apply when the defendant asks the reviewing court to rely upon trial evidence to reverse. Now, almost all of defendant's argument deals with his mother's testimony at trial. She did not at the motion to suppress. So I just put that out there for all of this evidence from the mother. I want to briefly touch on something that the defendant said in his reply brief and also here at oral argument is that the claim that the state conceded that the defendant had an expectation of privacy. This is incorrect. What the defendant is referring to was an argument made to the trial court about a case called People versus Herald. And the citation to it is not in the record, but it is 226 LAP 3rd 866. But they do cite it and argue it in the argument on the motion to suppress. And all they were doing at that time was discussing the facts of Herald as compared to this case. In Herald, the court set out the warrantless observation of contraband and criminal activity was okay. But then you had to retreat and go get a warrant to search further. And so what they were saying was that getting this second or third search warrant did not mean that the state was conceding the expectation of privacy. They were just discussing the fact that Herald had said the first search, which was just visual, was okay. But the second and third searches were unreasonable. And so I disagree with this alleged concession. One other thing that's in the reply brief that I disagree with, I don't think defendant raised it here on oral argument, is whether it says that the state does not dispute that defendant was legitimately present in the area search. He most certainly was not present in the area searched. And that is in the record and it is in the state's brief. We note that the defendant fled. He says he hid behind the garage. But in any case, he was not present during the search. So he was not legitimately present in the area searched. And the state does dispute any holding that he's was. So are you suggesting that he was literally right behind the garage the entire time? Or was he outside of his mother's property, off of his mother's property, in some adjacent property at the time? They looked for him. They didn't find him. Defendant says he was behind the house or garage or something, but whether that he was still on his mother's property or not, he hid. It's what he did. And then they didn't find him. So I can't give you an exact answer to that. But he wasn't at the home. I didn't see anything like that in the record, so I wasn't sure. And I thought maybe I missed something. I think the defendant, I mean, we know he wasn't there. That's given where he was. Defendant testified at trial, I believe it was at trial, that he was kind of hiding behind the garage. But that's what I know. Okay. So I'm kind of going to Justice Barberas, your question about the fact that the mother owned this property. There was no lease. I want to talk about an expectation of privacy. This doesn't just hold to two people. It doesn't necessarily matter whether it's defendant and his mother or defendant and other people. The factors that determine whether someone has an expectation of privacy, which are in our brief, is property ownership is one of the factors. Certainly the mother owned it. Whether the defendant was legitimately present in the area searched, he was not. The defendant's possessory interest in the area searched. The state doesn't dispute that the defendant had access to this room. But first of all, let's go to a statement in the briefs several times, and that is that defendant had the only key. And this simply is not supported by the record, nor does it affect the fact that his mother didn't have a key. By both parties' admission, they both had keys to this place. His mother had a key. He had a key. He lost his. And when she did testify at trial, she says, you took mine. So it's not like when he started living there, she said, here's the key to the room and she gave him her key. That's not what happened. They both had keys and he lost his. That's not her fault. That's not a concession that he now has sole access to this property. The other thing is, and again, Justice Barbaros, I believe you mentioned this. There's a lot of other people that had access to this room. There are other people that had keys. The defendant's wife had a lease, had property, and she had a key. The lease in and of itself shows that the defendant's mother knew how to create a special access to property. She didn't have any access or lease with the defendant. She just basically said, I'm going to throw down my sleeping. I'm sorry, I'm getting. He just had a sleeping bag in there and it was okay with her. But we do have his wife who had a lease property and a key. Did they have a written lease with the wife? Yes. His girlfriend had a key. His girlfriend had access. I don't think she had a key. There's a man named Kevin who's not entirely, I don't know more than that. There's several people named Kevin in this case. But by the defendant's testimony, Kevin had a key to the place. There were, by his testimony, six people that had access to this place. Let's suppose this, now in the reply brief, the defendant says, well, they hadn't been there recently. They hadn't been there since the defendant was sleeping there. One thing briefly I want to note is that although there are places that says the defendant had been there for a year, defendant says he'd only been there for four months. Again, there's conflict in the record. That's what the defendant says is that he was only there for four months. But in any case, this is a hypothetical. Suppose this was a rental storage building. We see these all over the place nowadays. Suppose six people have their stuff in it, tools, bicycle parts, as you mentioned, guns, stuff. And the stuff the defendant says was not his. They all have access to, they put their stuff in this building, in my hypothetical, in a rental storage building. Some of them have keys, some of them don't. Sometimes it's locked, sometimes it's not. The fact that they haven't been in there recently, for example, the wife, she moved to Florida, she needed a place to store the stuff she couldn't take with her. She didn't lose a possessory right to enter that building and get her stuff simply because she hadn't accessed it recently. So, when six people are storing things in a building, one has a key. Now, as you noted, Justice Barbaros, this place was not locked. I don't know that you have an expectation of privacy in that building. Now, going to the mother in particular, I think when you watch how she reacts, the police come and, as defendant notes, he knocks on the door, on the building, actually. They don't ask the mother to come out, the mother comes out and she says, I don't think he's home, let me look. She goes, she does this knock on the door, which the defense says she did, the judge did say she might have done this because they were looking for an armed person, so she might have been cautious. The other thing he says is, and I think this is reasonable, might have been common courtesy. I mean, if you're going to walk into a bathroom and the door's shut, you go, and this is what she did, knock, knock, open. She didn't sit and wait for somebody to answer the door after she knocked. She walked in that building, she walked into it, she opened the door, she said, he's not here, come look. And I think, see, I'm out of time, but I think that what I've said today combined with what's in our briefs are sufficient to support the motion to suppress. And I don't, unless you have any questions about the massive amount of gun law case that's come out of this court about possession of weapons by felons, and since we conceded the last issue, I have nothing else. Okay, that was the question I was going to ask you. You touched on it very succinctly right there when you pointed out that you have conceded on that last issue. One question I do have, just to throw it out there in regard to the gun law issue, the fact that this gun was inoperable, does that have any, make any difference to possessing the item? Because if the gun is inoperable, an argument can be made that it's no different than a hammer or a brick. It can't fire a round in its current state. Does that make any difference under this case, or in this case? I can't cite a case to you that says that, but it is my firm belief that it doesn't matter that the gun was inoperable. Okay. Any questions, Justice Vaughn, Justice Clark? No, thank you. I have one question. Procedurally, if you're conceding the 604D certificate was untimely and it needs to go back for that compliance and give the defendant an opportunity to file a new motion to withdraw his guilty plea, procedurally, we're still all right deciding the suppression of evidence issue, although that's a whole separate thing for us to consider. It was actually two separate trials. There was a jury trial on the possession of a weapon by a felon, and then there was a separate, they were severed, and then they had a guilty plea on the direct trial. Thank you. Okay, thank you, Ms. Shanahan. Mr. Coltsy? Yeah, so I have three points on rebuttal, and possibly additional if you have questions. First, regarding the state's argument for the first time here, oral argument that to examine facts from trial can only be used in a holding decision. I don't think that's consistent with Illinois case law. I think the argument is waived, first of all, for not including it in their briefs and allowing an respond. But in the opening brief, I do cite that people need Horton, and it specifically says that in reviewing a trial court's ruling on motion to suppress, the court may consider the entire record, including trial testimony, particularly where the defendant has preserved a challenge to the court's ruling on the motion to suppress. So if the subsequent proceedings can only be used to uphold a decision, then I don't think the fact that it would be preserved, the question of preservation by defendant in a motion, which Mr. Finley filed several motions for rehearing a new trial here on this subject, would come into play. So it's clear that the court may reuse the facts that came out later to examine the issues of, I mean, common authority, legitimate expectation of privacy. I think there are enough facts here specifically regarding legitimate expectation of privacy, even without the trial record, but those certainly are the strongest facts. So I don't think that the state's contention, and if this court is, would request supplemental briefing, I'd be happy to do so. The second point is the state discusses whether it engaged, you know, at trial regarding the issue of legitimate expectation of privacy. And in our brief, we cited the Supreme Court's recent decision on a Fourth Amendment case, People v. Hagstead. And the court said where there, where below, the state did not challenge legitimate expectation of privacy, but instead jumped right into contesting only common authority and apparent authority, those arguments were inconsistent with what the, with raising a challenge to legitimate expectation of privacy, and therefore those arguments were forfeited on the field. And the court noted that forfeiture. It still did an examination, which I think the same result recurs here. He did have a legitimate expectation of privacy. Regarding the legitimately present factor, the arguments in my brief and my view of that factor is not whether he was concurrently contemporaneously home during the actual search, but whether or not his use of the space, his prior use of the space was a legitimate authorized use. And this distinguishes cases where people are using a place that they aren't allowed to. And you can't say, well, now you have a legitimate expectation of privacy in that space, even though you were never authorized to use it, because you know you weren't supposed to be there. How can you have an expectation of privacy? And that's not the case here. Mr. Finley was legitimately present in the space search, as in he had lived in this space for 11 months and was legitimately present there to establish his expectation of privacy. Let me respond to Ms. Shanahan's statement that somewhere in the record the defendant himself asserts that he was only there for four months. I think Mr. Finley was trying to, you know, estimate the amount of time he lived there. It's clear that Ms. Estep said that he had lived there for 11 months based on the dates of when his wife had moved to Florida and functionally moved out of that storage space and taken most her items. And she stated Finley moved in right after. And so I think she would be, you know, perfectly competent in knowing how long he'd been staying in that space. How do we balance that, though? I mean, the defendant himself would be perfectly competent to say how long he'd been there as well. Yeah, so there's a chance that Mr. Finley misestimated how long he'd been there. But regardless, 11 months or four months is a significant prior use. I think it's enough time to establish a legitimate expectation of privacy. If you live somewhere for 120 days sleeping in it and using it as your residence and you don't reside anywhere else, you would have a legitimate expectation of privacy. There's plenty of people who have month-to-month leases and stay places at a month and they would have legitimate expectation of privacy. So I think four months easily satisfies the conditions that gain. I think the significance of the four months as opposed to the 11 months or the year is that we have an allegation that several other people were using this facility or had use of this space for storing items and going in and out and so forth and so on. So it may come into play for that regard, don't you think? I suppose there's a potential that that time discrepancy could allow for other people to previously access that space. But again, that would be before. If we believe Mr. Finley, that he only lived there, if we take that as true, that he only lived there for four months and people accessed the space, that would have been before he was living there. There's every indication that Mr. Finley, and this was stated by Mr. Eastep, he purchased a lot and locked the door. And for some period of time, unknown period of time, unclear of the record, they both had keys, which the state had mentioned in their arguments. And Mr. Finley did indeed lose his and Ms. Eastep chose to give up her access, her only ability to control the space. She chose to give her only key to Mr. Finley. There's many options. Okay, but the argument can be made that if she gave him her key, she could have requested it back at any time. She could have requested it back at any time, but she did not request it back at any time. She could have also copied the key and said, you know, let's make a copy so I can have access in there. But she had no reason to have access in there because she'd never used anything. And so she was honoring his expectations of privacy inside of that space. Furthermore, she could have said, you know what, get a new lock. I need to, I need to have access into there. I don't use anything, but I want to make sure it, you know, I, it's my sunroom. I want to look into it. She did none of those things. And she said, you know, she said the only reason I went into that space was no more than a few seconds, a couple of times to specifically converse with Mr. Finley, which shows that there's no evidence that she ever used the space when he there, that she was even allowed to be in that space when he wasn't there. All right. I see your time is up. If you, if you want to. Yes. In conclusion, I would, I would focus on the three points. I started this argument with Mr. Finley had a legitimate expectation of privacy. It was, and he, the common authority didn't exist and apparent authority did not excuse the warrantless search. And we ask that you suppress the evidence and reverse his convictions outright for the firearms and the ammunition. Thank you. Okay. I'll, I'll start with one question and open it up to justice Vaughn or justice Clark, but just as Vaughn asked Ms. Shanahan at the end of her presentation about the procedural stature of the case, if we remand it, should we be addressing these other issues? Yeah, I think the issues are separate in that his second, his motion to withdraw guilty plea involved a severed trial and a separate charge that that Mr. Finley has. So he should be allowed the chance to withdraw his guilty plea if he, if he chooses and, and have a council review his, his plea properly with a 604 D certificate. But I think that's independent in some regards to the determination on the motion to dismiss within which involved the other charges that were severed, the gun and the firearm. I encourage this court to consider, you know, the resolution, the motion to suppress. Okay. All right. Thank you. Justice Vaughn, justice Clark, any questions? I have a question about what you described as ambiguity and the officer's duty to inquire further. The trial court heard the officers testify that they're at the sunroom exterior. She comes out, brief knock, goes in, says, come in. I'm trying to understand what's ambiguous about her authority to allow them to come in. So the ambiguity exists by the very as their residence and another is living in a separate space. So we have two defined spaces where one person resides and has an expectation of privacy. And the police knew that he lived there independently and that this, the structure was separate. And further, they knew there was some sort of extended use. They had been there previously and they knew that they lived separately together. And there was outside indication that Mr. Finley was using the space for his purposes with his bikes, his toys, they called it. And so when these situations arise, the ambiguity is present that there might be some limitations on this ESAP's ability to enter that space based on the fact that he's living there and using it as his residence. But my question is, the trial court heard the officers testify. What did they know about her ability to enter that ability, that building and invite them in that makes her ability ambiguous? So what did they know? They knew about her ability to access the space was that, you know, she indicated, well, they knew that she, that they didn't have any evidence of prior use, that she wasn't in the space as a resident or someone else. When they and check, they didn't say I can go in there and she didn't portend that she would open the door for them. I don't think they thought that she would ask, invite them in. And so, and they knew that she knocked before she went in. And so the situation was ambiguous where the police had a duty to inquire further to resolve. They assumed she could enter the space anytime she wanted when he wasn't there. And they assumed that there were no restrictions on her entering. And that's the type of assumption that cases like people will be James, this court's decision and people will be Pickens say the police cannot make, they need to take a second. And reason, reason inquiry requires a similar simple inquiry that the police made here just earlier. What is your ability to access the space? Can you normally come in here? We know it wasn't onerous. It took maybe I think you know, officer Spindler testified. It was a short conversation. If you look at the break in the body worn camera officer Brewer goes back to his card to get a camera to document the evidence. And there's about a two minute time span from when he's not at that space. And another officer, presumably officer Spindler comes up and says, we're going to need to get a warrant because that's primarily Joey's space. So this is a short conversation he has with Missy step. It could be resolved with one question. And we know what, you know, the very fact that officer Spindler himself, once he was confronted with the fact that there's evidence here that we want to recover, he then resolves the ambiguities that existed. He says he has a short conversation and determined she didn't have consent based on the fact that it was typically locked when he wasn't there, which is all that was missing in this case is what is the nature of the relationship between Missy step in this space? What are the limitations on her accessing it based on the fact that Mr. Finley lived there and based on the fact that the police knew we lived there and that there were separate residences and that they had no knowledge of prior use of her being in there. I think on closer facts and people who are the police knew that the grandmother had been accessing the space that was contested that day. And this police still had a duty to inquire as to, what are the limitations of when you can access it? It can't be unfettered. And I think that's the distinction here. And I think that's why it was ambiguous. And I think that's why Lieutenant Spindler, in fact, did the inquiry. He just did it too late. He simply needed to do it at the moment she's transitioned from saying, I'll look to see if he's in there for you guys to come in and look yourselves. One is her ability is her just checking for the police out of courtesy. The other is inviting them in to search access and search his place. And so I think that's the point. That's the line of demarcation where they need to inquire further. And we're not putting an onerous weight on the police here to ask these questions. This is what the law requires and it would have been a straightforward inquiry. Thank you for your characterization of the firearm operability or inoperability is not relevant in this case, unless there's some evidence that was permanently inoperable. That's that your formulation of law is correct. So based on my research, the fact that the gun, it was, I believe referred to have a squib load. So essentially I had a bullet lodged in the, in the barrel, does not for the purposes of this statute, does not, does not matter. It requires broken down and non-function. Thank you. Okay. Thank you both for your arguments today and your briefs in this matter. The court will take it under consideration and issue its ruling in due course. You guys have a good rest of your day.